We'll hear Bellamy v. City of New York. May it please the Court. Good morning, Your Honor. Good morning. Kareem Bellamy spent 14 unspeakably horrific years in state prison because the truth-seeking function of his criminal trial was poisoned by Brady violations and other misconduct committed by prosecutors and police. Under Judge Walker's controlling opinions for this circuit in Walker and Myers, the City of New York may be held liable for the prosecutor's Brady violations based upon the allegations in our complaint that they were caused by the office-wide managerial policies of the Queens District Attorney. The District Court did not consider, certainly did not Are you asking for that to be, are you focusing on the Brady violations? I thought the municipal claims were focusing on the summation. No, Your Honor, it's both. The principal claim is the Brady violations. The summation of misconduct, we're claiming summation of misconduct as well. The other is the relocation, the Brady claim against The Brady claim involving the prosecutor Relocation Yes, the relocation benefits. That's the Chinese wall claim. Yes, Your Honor. But that's the only Brady violation that you're claiming. There were other Brady violations that are mentioned, but that's the one you're claiming for municipal liability. Yes, the municipal liability claim focuses on the Brady violations involving the relocation benefits afforded the witness Linda Sanchez. There's no claim in this case of failure to train prosecutors or the police on Brady. That's not in this case. That was the case in Walker, but that's not part of this case. Well, I think that the Chinese wall policy involves training. Yes, I'm talking about, but it's confined to the Chinese wall policy. It has nothing to do with the failure to turn over, make statements to the prosecutor about various witnesses' statements or misstatements at various times or other things of that sort. It's just the credibility questions associated with the payments that Sanchez received. Well, not quite, Your Honor. I think that we made it very clear to the district court during colloquy, during the summary judgment proceedings, which we asked, is your Brady claim, does it involve more than the Chinese wall? Does it also involve the failure to train and discipline? You're using that to sort of flavor the due process claim against the individual officers, but I'm talking now about the Monell part. Yes. And the Monell part is confined to the Chinese wall as far as Brady is concerned. The Monell part has to do with a number of different theories of liability. One of them is the Chinese wall policy. Another one is the failure of the Queens district attorney to properly train, supervise, and discipline prosecutors more generally in carrying out their Brady obligations. I thought that was confined to summation. No, Your Honor. That's the city's argument and what Judge Donnelly addressed. Okay. So I just want to be very clear on this. I'll go back and check to see what the pleadings say. So you're saying that the Monell violation, as far as the prosecutors are concerned, is both the summation and Brady. All the Brady claims that you make are chargeable to the city. The Brady claims involving the prosecution. Involving the prosecution. Yes. Your Honor, page 157 of the appendix. Not the Brady claims involving the cops. No, those are individual claims only. I think that's what the judge is driving at. All right. Well, okay. The point I wanted to make is that we made it clear to the district court, and our briefs have the citation to the record, that our theory is not only the Chinese wall policy as an unlawful policy or a policy adopted with deliberate indifference to the near certainty that it would result in Brady violations, but also that the Queens district attorney had a more general deliberate indifference to a pattern of Brady violations where the prosecutors were not properly trained, supervised, or disciplined, notwithstanding this pattern of Brady violations. Wait a minute now. The Brady violations, there are two kinds of Brady violations, right? There's the Brady violation because the prosecutor fails to turn over information of which the prosecutor is directly aware. There's another Brady violation concept, and that is the prosecutor fails to turn over information of which the prosecutor is not aware, but the police are aware, and the police never tell the prosecutor about it. So you're focusing on the prosecutors here, not turning over information of which they were aware, which prosecutor Guy was aware, and didn't turn over. There are also aspects of this case of which Guy was not aware, and that's not a part of that. I can see how that might go against the individual officers, but I don't know how you could fault the prosecution for that. I may be misunderstanding what Your Honor is getting at, and I think Judge Jacobs was trying to clear me up, but I just want to be clear that- He usually does try and clear up problems. I just want to be clear that our theory is, there's several theories. One of them is that the Chinese wall policy was an unlawful policy that resulted in Mr. Guy not learning about the thousands of dollars and additional undisclosed financial benefits. The other theory, which we made clear to the district court repeatedly, is that the Queens District Attorney was so deliberately indifference over a period of years, and after numerous Brady violations against his office, to these kinds of Brady violations, that prosecutors were not disciplined ever for the Brady violations, or the summation misconduct, that there was a tolerance in the office that encouraged- where there was a concentration only on winning, and there was a lack of concern with violation of constitutional rights, so that there were more than 100 cases involving summation violations and Brady violations. Now, the Brady violations are not, with a couple of exceptions, listed in the complaint, and we would amend the complaint to make them clearer, to lay out the pattern of several dozen Brady violations. You have a clear Brady claim, and it's the only one that can be considered under Monell, because it's the only one that involves a prosecutor. That deals with the relocation assistance, and the fact that she was getting relocation assistance, that's Ms. Sanchez, was disclosed, and your client's threat to her came out, and it was clear that she was being protected. And you get protected because people put you into premises and pay the rent. So what you're complaining about, to use your words, are additional undisclosed benefits. So I'm not sure we're looking at this horrible Brady violation by the prosecution that becomes an instrument for generally reforming the way in which this DA's office conducts its business. Well, focusing on what the Brady violation was, for 18 months she had numerous interactions with police and prosecutors. She never once said she was threatened, even though her trial testimony was that the threats occurred shortly after the homicide. The prosecutor elicited from her in her testimony that she received $50 in subsistence payments and would receive another $50, period, and then she would be assisted in obtaining relocation. What they did not disclose was that before she testified, she was promised, after a discussion of her desire to move from the tiny one-room apartment she lived in- A two-bedroom apartment. With a two-bedroom apartment, and that they would pay her $25 a day for the months that it would take for her to be relocated, not $100, that they would pay for her lodging, free lodging, which there was testimony in the record amounted to $70 a day. We're talking about thousands of dollars of benefits to a woman who was on public assistance living in a tiny room with five people. So let me ask you this, just to follow up on Judge Jacobs' question. The prosecutor said, as I recall, before the jury was brought out, she's getting the $25 a day, she's going to get a total of $100, but he also said, and we are helping her to relocate, present tense, something like that, am I right? So isn't it then sort of up to defense counsel, at least I realize it's the prosecutor's Brady obligation, to say, okay, well, I wonder what that means, we are attempting to relocate her. I mean, that doesn't happen overnight, right? I mean, in other words, wasn't the gist of it disclosed? No, Your Honor. And this calls to mind Judge Jacobs' decision in the Lika case. Immediately before this witness testified, for the first time, there was a limited disclosure about the benefits she was receiving, and the prosecutor said, quote, and this is at page 2464 of the appendix, we have also afforded her some meal money for several days. I believe it's $25 a day, so I believe she is getting in total approximately $100, and we would be continuing with our efforts to relocate her. That's what I meant by present tense. Yes. Yes. So they're going to assist her in relocating, but that doesn't mean that they're going to be paying her $25 a day for months. It doesn't mean that they're going to be paying her hotel for months. The defense lawyer was entitled to rely on the extent of the disclosure. He wasn't obligated to go into a fishing expedition in front of the jury. No, no, but the judge wasn't there at that point, just so we're clear. No, but this is the full extent of the disclosure minutes before this witness took the witness stand. When the people had months to disclose the circumstances of this witness's financial arrangements with the prosecution. And the other thing is that. She'd only been in the program two days at that point. Well, she had been picked up two days before. That's correct. But what they also didn't disclose was that they arrested her on a material witness warrant, which directed them to bring her forth with the court for appointment of counsel and bail proceedings, and they illegally took her to a hotel room in a safe house. They held her, even though she said she wasn't in fear, she didn't fear any threats, and she didn't wish to be relocated. They held her with the suggestion that she would be held indefinitely. As a matter of fact, she was told, we're going to hold you and we're going to relocate you. And that's Brady? Yes, that's Brady. Imagine when you have one party to a litigation, it takes a witness prisoner. The coerciveness of that to induce the witness to give favorable testimony. And then after they did that and they took her prisoner, then they began a conversation with her about inducements to give favorable testimony. And that's when the thousands of dollars of benefits were promised. Just to be clear, I thought I studied the deposition testimony pretty carefully. I don't remember thousands of dollars in general. What I remember from Cox was seed money, one month's rent, one month's security, and I think it came out in the end to about $2,800. Am I right about that? And Section 8 housing. And she was promised a Section 8 housing before. That's in the record? Yes, but at page 3359 of the appendix, Detective Investigator Cox, who was an administrator of the program, said, right. And explaining what he instructed the witness, you say, look, permanent housing won't happen in two or three days or a week or a month. Chances are we're going to put you in a transition housing, correct? You would say that, answer the conversation, we'll go along those lines, yeah. And in his deposition, he goes on to explain how he told her before she testified that this process would take a very long period of time. So she knew that this woman was a desperate woman. She has three young children living in a tiny room. And she's now all of a sudden being given the promise of a two-bedroom apartment and $25 a day indefinitely in a free hotel room. She described the safe house. $25 a day indefinitely was promised to her before? Where's that in the record? That's at page 3318 of the appendix in her deposition testimony. She says she was promised before trial. Okay, I'll look it up. Can I go to another? Yes, Your Honor. I'm going back to the other Brady claims or potential Brady claims that you're asserting here. And I want to be very clear. First of all, with looking at Sanchez, apparently she made some statements that were not turned over to the prosecutor. Is that right? That is the Beer statement, the statement about the fact that it was that particular day that Bellamy was in the store. He was disappointed because he couldn't buy the beer, which would have put it on a Sunday. Sunday blue laws were in effect. Sunday blue laws. And that apparently was not turned over to the prosecution? That's correct, Your Honor. And not turned over to the prosecution, therefore not to the defense? That's correct. And also that she said he was with Lee, his alibi witness, at one point, and that wasn't turned over? No, it wasn't turned over. Linda Sanchez testified at a deposition that after the lineup, the police showed her a photograph of Terrell Lee. She identified him as the second person who was with Mr. Bellamy, even though the police had interviewed Terrell Lee and concluded that he wasn't present at this time. Was that withheld from the prosecution? Yes. And also the fact that she originally told Gillen, I guess it was, or maybe it was the other officer, that she didn't see anything? That's correct. It was never turned over? Yes. And also the question I have here is, as far as Veronica Walker's statement is concerned, there's a DD-5 that's prepared, which she refused to sign and later said that, or told the agents, later testified that she told the agents was not true. Well, no, she later testified at a deposition. Later testified it was not true. And you're claiming that neither of those items were turned over, correct? That's correct. The fact that she didn't sign, and A, that she didn't sign, because the DD-5 was sent to the prosecutor, but there was no statement made that she refused to sign it. Well, the DD-5 was false because she testified at it. Apart from that, there was no statement made that she refused to sign it. And she did refuse to sign it. She did refuse to sign it. And also said that it wasn't true. And that was never turned over to the defense or to the prosecutor. That's correct, Your Honor. But we stated a Brady claim, not only an evidence fabrication claim with respect to the falsehood. Right. And the district court didn't confront the Brady claim. She dismissed the entire complaint without ever discussing the Brady claim. Why didn't you raise that in your opposition to the summary judgment and say, hey, look, they say they're moving for summary judgment on everything. They haven't even touched this Brady claim with respect to Ms. Walker. Well, there were a lot of claims that we had in the complaint that they didn't touch on. We didn't brief. I mean, our 56.1 statement had all the facts supporting the Brady claim. We didn't separately brief the Brady claim, but they never made any argument directed to the Brady claim. And the law is very clear in this circuit that where the moving party doesn't make any argument, if the district judge is going to reach the issue, then he or she has to give notice to the non-moving party. Now, the other problem is a problem I see in your case, though, has to do with as far as the failure to the Monell theory, the second Monell theory, as far as it's based upon the summations. And that is that the summations were never objected to, A, at the trial, and they weren't appealed. So how are they material? I mean, why isn't that very powerful evidence that the problems weren't material, even though you do point out particular statements that I think could have been corrected if they had been raised to the judge? Every time defense counsel made an objection, and he did to several of them, the judge said, your objection is noted, and then let the prosecutor continue. They didn't object to this. Well, to several. Even other times. To a number of these he did. But the problem, of course, we all – your Honor was a trial judge for many years. And the problem that the defense has, particularly when the judge indicates that he's going to or she's going to deny the objections, even though they may be meritorious, is that it gives the courts imprimatur on the conduct of the prosecutor. And it's true that – You wait until the jury goes out. You say, Judge, I have a record to make. I moved for a mistrial. It's really bad. There are many things he could have done. That's certainly a valid point, Your Honor. But that's only one – this circuit's case law makes it clear. You're saying that that's not a requirement that the evidence, that the error be preserved for a 1983 action. That's correct. It's one factor. I'm not saying it's insignificant. But given the egregiousness of the misconduct, I know who committed the murder. He's not going to get away with it, not this time. The argument about Linda Sanchez, no conceivable motive to lie, when the DA's office is sitting on the evidence that she received thousands of dollars in undisclosed benefits and had been taken prisoner by them. I just think that the summation of this conduct is so egregious in this case that that factor, though not insignificant, is not – On your side is the fact that he discussed – Guy discussed with his superiors the fact that this was such a thin case that it really – everything turned on the summation. That's true, Your Honor. The Court has no further questions. You've reserved rebuttal. Yes, Your Honor. We'll hear you then. Thank you. Good morning. Good morning, Your Honors. May it please the Court, my name is Megan Montcalm, and I represent the appellees. Try as he might, Bellamy cannot generate a fact issue for trial here through speculation and distortions of the record. Despite having litigated through his criminal trial, extensive collateral proceedings, and significant discovery here, he still lacks credible evidence substantiating his ever-shifting theories about the alleged constitutional violations. Let's take a few of these examples. That's – the only question here is whether this case, in my view, could be decided on summary judgment or whether not, or whether there are disputed issues of fact. And so Bellamy's statements in the squad car, which were used, were denied by Bellamy all along. Now, he's – so he's never admitted that. So that's – you've got a dispute there, it seems to me. And the odd thing about that statement is that the officer – I think it was Gilliam, who was in the back seat – said that he shouted it out. And if he had stated it, one would have thought that the prosecution would have offered the statement of anybody who was in the front seat to corroborate that. But that didn't occur. And so that – but anyway, why isn't that an issue that's contested? Yes, Your Honor, we are at summary judgment here. And in a case like this, where a claim comes down to only one witness's word against another, when deciding whether there is a genuine issue of fact that needs to go to the jury, it is proper in some circumstances to consider whether any reasonable jury could find in favor of the nonmoving party. And that requires some assessment of their credibility. But then there would be an argument not just he's lying or one's lying or the other's lying, but also the circumstances in which it was made, where he'd been just picked up for the beer question. I mean, there was no murder investigation that he was aware of at the time. And just to sort of work that out, and the fact that it was not in a DD-5, and in the fact that that's normal practice to put such a statement in a DD-5,  and so that's the argument that the other side is making, that this came up after the fact. This was something that he came in in a closed case. He generated this after the fact. I'm not saying it's plausible necessarily, but that's not the issue. The issue is whether there's a disputed issue of fact here. Sure, Your Honor. And again, this comes down to whether there is a genuine dispute, whether this is credible enough to get to the jury. And I'd like to address the points that Your Honor has raised. So first, as to whether Bellamy has consistently denied making these statements, his view of what happened on this date never came out during the course of the criminal proceedings. Even though he had a suppression hearing, he didn't elicit the sequence of events through cross-examination. He didn't himself testify, which he could have done. If you look at his deposition, he's claiming that he was held at gunpoint, that he was coercively interrogated, they put bloody pictures on the table, that all of these things happened that day. How is that now that we're in the 1983 phase? Ultimately, the 440 Court looked at this case, even after the fake tape, and came to the conclusion that the evidence was such that there should be a new trial here, and that was affirmed on appeal. And then the State did not proceed further. So how relevant is what actually happened at the trial? Well, this argument about his statements having been fabricated actually only came out in this civil proceeding. It wasn't something that was litigated through the criminal proceedings, and it has the markings of something invented after the fact to fit the record that existed. To the point about the document. Those are things juries decide, right? I mean, that's for the jury. Well, fair enough, Your Honor. In an appropriate case, a claim could go to the jury. But what the district court . . . In this whole case that involves disputes, it seems to me. Well, let's take another one, and that's the identification of the DD-5. Veronica Walker said she never identified the defendant, and that she refused to sign the DD-5. A DD-5 was prepared, which was wrong, she says, and it wasn't true. And she refused to sign it. Now, apart from the fact that that's not turned over to the prosecution at the trial, it seems to me that that's an issue of fact as to whether that would have a bearing on this trial when the prosecutor did take advantage of the fact and claimed in a letter, I believe, to one of his higher-ups, that notwithstanding her inability to identify, she was useful at the trial. And at the trial, the prosecutor referred to the fact that she couldn't identify the defendant in court, did not know that she refused to sign the DD-5 or that it wasn't true, but then proceeded to make as much of that as he could and said, well, she was kind of a half-witness. The jury even asked her, didn't you tell the agents, as he would have done because he'd seen the DD-5, didn't you tell the agents early on that you identified him? She said, no, no. And then the prosecutor used that at the trial to say that you can look at her, and the implication was that she was scared and she wasn't candid. And so it was used to kind of corroborate the other identification testimony. Why isn't that something that has to be decided by a jury? With respect to the fabrication of evidence claim, that doesn't go to a jury because there's no indication that this DD-5, which was allegedly fabricated, ever made it before the jury, and therefore it could have had no impact on whether— It was not introduced into evidence. It was not introduced into evidence. And our Dufort case says that if it's not introduced into evidence— Absolutely, Your Honor. We don't consider it for this purpose. Right. It did not contribute to a deprivation of liberty. It did not go before the jury, and in fact— But there was one thing before the jury. She was asked whether she had said a thing that was in the DD-5, but she denied it. That's correct. She denied telling detectives that she had recognized this individual as Bellamy. So her exculpatory report that she allegedly gave to the police during the interview actually came out at trial. That's the evidence that went before the jury. She did not, right? My understanding from plaintiffs is that she says that she told the police it was not Bellamy. That's the Brady claim, that that was not turned over. That didn't come out at trial, did it? It did, effectively, through her testimony. She said, I didn't recognize the person who ran behind my car. I didn't know his name. I didn't know who it was. But she said it looked—it was consistent with how Bellamy looked. Well, she did testify that she had told detectives that it could have been Bellamy. Isn't the same as disclosing that she had told them it was not Bellamy? But that's the way that she responded to the prosecutor's question. And defense counsel here had the DD-5, had the handwritten notes. He could have cross-examined her further, and he chose not to do that. And, in fact, he took advantage of her— The DD-5 was wrong. But defense counsel having it and having her exculpatory report on the stand could have— He didn't have the knowledge that she had denied the DD-5. Yes, Your Honor, but he did have what she actually told the jury, and that's what matters here. That was something that could have been turned over, that she had never acknowledged the DD-5. And, you know, but you're saying that that's irrelevant. Looking at whether or not there was a due process violation here— Should we make something of the fact that the prosecutor in summation tried to turn that in his favor? I think you have to look at that summation in context against the defense summation, where defense counsel brought out all of this testimony from Veronica Walker. He thought it created a reasonable doubt. He re-read it to the jury in his summation. Wouldn't it have been even more powerful if he had said, and she denied, she said it wasn't Bellamy? That would have been an even more powerful summation, right? What defense counsel said was that she only said it could have been, which means that it could not have been. The fact that she told the police earlier that it wasn't was not brought out, couldn't have been brought out because that was unknown to the counselor. Did you tell the police you recognized this individual as Bellamy? And she said no, and that was testimony on the stand in front of the jury. You didn't move for summary judgment on the Brady claim on this issue. We moved for summary judgment on all of the fair trial claims collectively. You made a brief statement that the judge didn't address it. Well, not specifically. We addressed the claims collectively. But here, to the extent that counsel's arguing a lack of notice, I'm not sure what impact that makes because there's a voluminous record before the court. He's not suggested that he would have put in some other evidence to make this argument. And this court reviews de novo. What about the totally confusing combination of evidence having to do with Linda Sanchez and her statements intended to exculpate the defendant? A, that she saw him on a day when you couldn't get beer in the morning, which would have put it on a Sunday. We all know the murder was on a Saturday. That was never turned over, so there couldn't be a testimony on that. The fact that she said that Tara Lee was with the defendant that particular day, which the defendant says was his alibi, and later on was never turned over. And the fact that the see anything statement was never turned over. Why wasn't that, why isn't the absence of that being turned over to the prosecution highly relevant as to whether or not she was, and the defense would have had it, an ability to cross-examine and put her testimony into doubt? Because, Your Honor, a close reading of the record refutes all of those claims. So Sanchez made these statements in the 440 proceedings and in her deposition here in some instances. But if you read the testimony at the 440 in the deposition, you see that these really were not material things and there's no evidence they were intentionally suppressed. So with the comment that she didn't see anything, she explained at the 440 at that point she didn't know that they were investigating a homicide. I understand that that's your strongest of the three that I've mentioned. But the Tara Lee statement seems important because that was his alibi witness. But there's no evidence that Gillen or Salamino, who are the two individual defendants here, knew that she had made that statement. Gillen testified that he did not show her the photograph of Tara Lee. He didn't see anybody else show her that photograph. The ADA, who was present for the lineups, also testified that he wasn't aware of anyone showing her that photograph. Salamino wasn't even in the precinct when the lineups happened. So those witnesses testified that they have no knowledge of her having seen the photograph. And she, when asked about this, did not identify the person who allegedly showed her the photograph. She said she didn't know who showed it to her, that it was, quote, they. They showed it to her. Apart from the merits of all of that, wasn't that something that the defense lawyer could have used? But there's, again, no indication in terms of civil liability that these two individual defendants knew about this purported statement at a relevant time before the trial that they could have turned it over, that they had any knowledge whatsoever that she purportedly had made these statements, because this didn't come to light until her testimony years after the fact. When did the testimony about the sale of the beer come to light? Not until the 440 proceedings in 2007-2008, so more than 10 years after the criminal trial happened. And even at that point, she said there was no doubt in her mind that she had seen Bellamy and Abbott on the day that he was murdered together. And the 440 judge evaluated her testimony and said he thought that these statements on her part were the product of a faulty memory, that he didn't think she was remembering correctly. She said she could not remember. That was, like, 10 years later. But she categorically said it was a Saturday. Well, in her deposition, when she came back here for civil deposition, she said, I was confused at the 440, but I know now it was a Saturday. I talked to my family. Like 15 to 20 questions, each one varying it a little bit, a little turn of the screw, until she said she, you know, she at some point told somebody. Right, with respect to it being a... About the beer thing. Right, that's correct. You could be denied the opportunity to buy beer in any event if you're being carded and you don't have identification. Certainly. You can be denied getting beer if you're inebriated. Certainly. And she never could say particularly when she had this conversation. So, again, there's no evidence that the detectives who are named in this civil case knew this at a relevant time and intentionally did not turn it over to the prosecution. Well, Your Honor, first of all, I'd like to not refer to them as benefits, because as this Court is well aware, this was a woman who was threatened twice by an accused murderer. And she came forward and disclosed that information only shortly before trial. But at that point, the DA's office took this very seriously, that she had been threatened twice. She was a young mother with two young children. And they immediately acted to move her into the Witness Protection Program. And the prosecutor immediately then disclosed that to defense counsel. As Your Honor remarked, that happened outside of the jury's presence. There was a disclosure of the two threats. Also the fact that she was receiving a per diem. Well, the threat did come to the attention of the jury, the prosecutor. It did then also. It did then also after a hearing outside the jury's presence  The prosecutor disclosed that they were... What do you do with the basic issue of... Look, he says in very brief language, she's getting $25 a day, she's going to get a total of $100, and we are continuing our efforts to relocate her. Now, that's not the same as saying, and we told her, one month's rent, one month's security, and I guess Section 8 as well. It's not quite as specific or as significant. What do you do with that? Your Honor, first of all, I'd like to correct that misrepresentation. She was not promised Section 8 housing. Before? Never. Never was promised Section 8 housing. And, in fact, this was litigated extensively in the 440 proceedings, and there was a finding in that decision that she was not promised Section 8 housing. But there was this... Cox talked about seed money, right? He said, yeah, we told her the seed money before she testified. So Detective Cox did testify that when witnesses come into the program, it's a fluid situation. They're not made specific promises. They're told that they'll be kept safe. That's first and foremost the most important thing when you have a threatened witness. So she understood she was going to stay either in a hotel or a safe house. She was allowed to be there without having to pay for it herself, that she could not stay there forever. She had to, on her own, find permanent housing. And she would get one month's rent and one month's security deposit. When she did eventually find permanent housing. I'd like the Court to keep it... That was promised beforehand. Detective Cox said that he would generally convey that to witnesses. No one testified... A reasonable juror could so find based on that evidence. Sure. I'd like the Court to keep in mind it was disclosed that they were assisting her to relocate. It was disclosed she was a woman on public assistance. The records reflect that she received rental assistance to pay the rent on her apartment, and she received food stamps. And when someone in that situation has to be removed from their living situation, they don't have the resources to pay for a first month's rent security on their own. What's the value of keeping this information? Your Honor, the information is not kept from the prosecutor. And I would direct the Court to Michael Mansfield's testimony... I thought that was a Chinese wall. Your Honor... No Chinese wall? No, and I would like to point out also, if the Court reviews the pleadings, you'll see that this claim, for purposes of Minnell, is limited to the alleged existence of this Chinese wall that walled off trial prosecutors from knowledge of assistance given to participants in the witness protection program. That's the scope of that claim under Minnell. The other claim with respect to training and supervision is summation. But the question is whether or not there is a practice or a pattern of a Chinese wall. And I direct the Court to Michael Mansfield's testimony at the 440 proceeding. He was the person who oversaw this program, and he said, yes, there was a wall that prevented trial prosecutors from arranging assistance for witnesses, because we didn't want even the appearance of a quid pro quo. But there was nothing that prevented trial prosecutors from learning about the financial aspects of the arrangements that were made for the witnesses. And here, again, the prosecutor disclosed this per diem, $25 per day, and the fact of the relocation assistance. But as Your Honor pointed out, Ms. Sanchez had been in the program for only two days at the point that she testified. But I just want to know more about the Chinese wall. So you're saying that the prosecutor was free to find out about whatever happened. There was no Chinese wall in the sense that we can't tell you because this is separate. That's correct. And I thought there was some argument that the idea was there wasn't going to be a quid pro quo, and therefore the prosecutor shouldn't find out, and if the prosecutor found out, then there could be a claim of a quid pro quo. No, Your Honor. The testimony was they didn't want trial prosecutors involved in arranging this assistance for the witnesses. Just because it was administratively something that prosecutors don't do very well? Well, it's potentially unseemly if you have a prosecutor telling a witness that they're going to be relocated. You could potentially have a witness asking for some additional benefit outside of what's necessary to keep them safe and to relocate them. So Michael Mansfield testimony at the 440 proceeding went over this in a fair amount of detail. Okay. We'll hear rebuttal. Thank you. You know, in any ordinary criminal trial, there's just a host of issues and things that loose ends and messy issues, but when a new trial is ordered in, say, a 440 proceeding, it raises an inference of a botched trial. Here, however, the new trial was ordered on the basis that somebody else confessed on a tape recording to doing this very offense, a man named Ish. But then it turned out that the entire tape recording was a hoax and that the person who advanced it was a liar. And yet, for some reason that escapes me, the state court continued, reaffirmed its view that there should be a new trial. I don't see where this, I mean, I don't see where any of the 440 proceedings really calls in any way into question the validity of this conviction. Your Honor, Justice Blumenfeld wrote a very thorough second opinion where he explained that the witness, that he credited the witness's initial statement to investigators and to the DA's office and to the defense before he had any reason to lie, before he thought he was going to get any financial benefit, where it just so happened that he named those two people involved, the very same people whose names had been given to the police at the beginning of their investigation, as the people involved in the homicide. It just so happened? Why? It just so happened that he named somebody whose name popped up in this investigation? No. It just so happened he tape recorded that person recording it, only it wasn't that person, it was his friend? No, Your Honor. The DA's office named two people who he had no way of knowing were the original two suspects in the police investigation, and he named those very same two people. Mr. Ish was his employer who had fired him. Am I correct? But basically, this case was thrown out on a confession that was a hoax, correct? Justice Blumenfeld said the confession was not a hoax. It was not a hoax? Mr. Ish was the person who was speaking on the tape? The tape turned out to be a hoax, but the statement that this witness volunteered... The tape was the confession that turned out to be a hoax, correct? The tape was a hoax. The tape was a confession by somebody else that they did this crime. That turned out to be a hoax. It was an actor of some kind. Was there a second statement? Yes, there were prior statements before any tape was made. Where, according to this witness, the real killer had confessed to him... Melville? Yes. Melvin or Melville or somebody? Melvin. Had confessed to Green that he was the killer. He explained why he was confessing and why the murder occurred, how the murder occurred, and then Green came forward to two investigators who did not suggest to him who they were investigating, and came forward to them because he knew them. They were experienced police detectives. They used to have a presence in the community. They were now retired. He volunteered to them the story of what really happened, and then he spoke to the defense counsel, then he spoke to the DA's office, and Justice Blumenfeld, after a very lengthy hearing and tremendous consideration... This is not a light thing for a state Supreme Court judge to overturn a 14-year-old murder conviction. He found that these events and the statements made by the real killer were credible, and on that basis he granted a new trial. I'm sorry. Was there an appeal from that? Yes, there was an appeal, and the people's appeal was denied. Was there a merits determination on that, or was it just leave to appeal? No, no, there was a merits determination, Your Honor. And that court affirmed Blumenfeld? It affirmed Blumenfeld that there was a substantial basis for his opinion. Didn't Justice Blumenfeld also find against the gist of what I've been calling the Sanchez benefits claim? He didn't, and if so, were you collaterally stopped? We're not collaterally stopped because since we won that proceeding, we had no ability to appeal it. So collateral stop under New York state law clearly doesn't apply. Right. My recollection is his reasoning was in part that she testified to exactly what was in the DD-5, which was well before she got any promises of benefits, and so the promises of benefits aren't material. No, Your Honor, I think his reasoning was that the same reasoning of the district court in this case, that there was no evidence that the thousands of dollars of benefits that she received after testifying were known to her at the time she testified, and therefore it couldn't have affected her motive. Couldn't he also point out that her testimony with regard to what she saw in the store and when she went outside was the same as what was reported in the DD-5, which was, of course, well before she received any such benefits? Didn't he also point that out? I'm not sure that he focused- Well, let me ask you this. Wasn't it the same? Well, except the defense didn't know that she had told the police. What happened was immediately after the murder occurred, she tells the police who come to her supermarket and are showing a photograph of the victim, and she testified. She knew they were investigating Abbott as the victim. She said, I don't know anything. I don't want to get into that. All right, but- Let's just stick with the benefits for a minute, okay? The financial benefits. Yeah, because the question is- In other words, don't we have evidence that these benefits, whatever they may have been, were not material in the sense that she testified consistently with what she had said to the police before she received them? No, Your Honor. First of all, her testimony was so all over the place that the prosecutor acknowledged that his case was falling apart, and that's why he took the desperate step of calling Veronica a witness cold. He never interviewed her. He called her based on the DD-5, his belief that she had identified Mr. Bellamy in the DD-5. That's why he called her, to deal with the Veronica Walker issue. But as far as Ms. Sanchez's- Is it in the record that that's why he called her? Yes, Your Honor. The prosecutor said so? Yes. He called her because his case was crumbling. He called Walker? Walker. What's that got to do with Sanchez? What happened with Sanchez is that Justice Blumenfeld did not have any evidence in the record before him that she later testified in her sworn deposition that the benefits, the thousands of dollars of benefits that she received were promised to her, and she discussed receipt of a two-bedroom apartment before she testified. They actually did not disclose to the court or to the defense the documents in their witness protection file, which indicated that there was a discussion that she was living in a one-room apartment and she was requesting a two-bedroom apartment, and that was never disclosed. And she testified in her deposition to that, but that did not come out the 440 hearing. That discussion took place before the trial? Yes. That did not come out before Justice Blumenfeld, so therefore he reached the same conclusion that the district court in this case reached. The difference is that the district court had before it the deposition testimony of Sanchez, as well as the DA's office, that the promises were made before she testified. As far as the Chinese war policy is concerned, because the case was dismissed, we received no discovery on the Chinese. There was some testimony, incidentally, about the Chinese war policy, but we have not been able to depose any of the supervisors who devised the policy, who have carried it out. We haven't been able to get discovery about the other instances in which it was applied and people's rights were violated. We haven't been able to take any discovery on the Betty case, or the Stedman case, or the other cases where the Chinese war policy resulted in crucial information being withheld from the defense. Okay. Thank you. Thank you both. Thank you, Your Honor. Rule reserve decision. The case of United States v. Gentile is taken on submission. The case of United States v. Rancourt is taken on submission. And the case of Amaker v. Anucci is taken on submission. That's the last case on the calendar. Please adjourn court.